**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MICHELLE F. HARTLEY, individually and on behalf of all others similarly situated, MARIA DEGENNERO, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO & COMPANY; WACHOVIA SECURITIES FINANCIAL HOLDINGS, LLC; and WELLS FARGO ADVISORS, LLC, as successor in interest to Wachovia Securities, LLC, <br><br> Defendants. | Civil Action No. 1:14-cv-5169 <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMAND** |

Plaintiffs, individually and on behalf of all others similarly situated, by their attorneys, The Law Offices of Christopher Q. Davis, PLLC, alleges, upon personal knowledge and upon information and belief as to other matters, as follows:

### NATURE OF ACTION

1.      This is a collective and class action brought by Individual and Lead Plaintiff and Putative Class Representative Plaintiff Michelle F. Hartley, Individual and Lead Plaintiff Maria DeGennero (together, the "Lead Plaintiffs" or "Named Plaintiffs") and all putative plaintiffs (collectively, "Plaintiffs"), on their own behalf and on behalf of the proposed classes identified below.  Plaintiffs and the Putative Class members were or are employed by Defendant Wells Fargo & Company, Defendant Wachovia Securities Financial Holdings, LLC, and, , Defendant Wells Fargo Advisors, LLC, as successor in interest to former employer Wachovia Securities, LLC, (collectively, "Wells Fargo" or the "Defendants").  Plaintiffs were employed by Defendant

1

Wells Fargo & Company in their registered broker-dealer, Wells Fargo Advisors, LLC, as

Financial Advisors in the Private Client Group.[1]

2.      The Named Plaintiffs and Putative Class and Collective Class of Financial

Advisors in Defendants' Private Client Group were subject to Defendants' unlawful blanket

exemption policy despite performing nonexempt inside-sales and "production" work, as well as

Defendants' unlawful Private Client Group broker compensation plan, which was loan-based and

required Plaintiffs to "kick back" earned compensation to Defendants, resulting in Defendants'

inability to guarantee the Plaintiffs and the Class or Collective Class of Financial Advisors a

consistent weekly salary at or above $455 per week, and intentionally denied Plaintiffs minimum

wage, gap time, and overtime compensation in violation of state and federal wage and hour laws.

The Named Plaintiffs and the Putative Class of Financial Advisors were also subject to

Defendant Wells Fargo Advisors' practice of making unlawful deductions from their earned

wages in violation of New York State wage and hour laws.  These employees are similarly

situated under Federal Rule of Civil Procedure 23 and the Fair Labor Standards Act, 29 U.S.C. §

216(b).

3.      Plaintiff Hartley, as the Putative NYLL and FLSA Class and Collective Class

Representative, seeks relief for the Class pursuant to the applicable provisions of the New York

Labor Law ("NYLL") and Collective Class under the Fair Labor Standards Act ("FLSA"), to

remedy the Defendants' failure to pay all wages due, in addition to injunctive relief.

4.      Plaintiffs are entitled to payment of previously earned and unpaid overtime

premiums, gap time wages, minimum wages, and unlawful deducted wages under the FLSA and

---

[1] Financial Advisors in Wealth Brokerage Services, Independent Financial Advisors in the Profit Formula and FiNet practices, and New Financial Advisors trainees are not included within the class definition.

[2] Wachovia Securities, LLC, now known as Wells Fargo Advisors, LLC, is a wholly

the NYLL because, at all points during the Class and Collective Class Periods, Defendants intentionally and knowingly implemented, maintained, and/or enforced compensation and other policies and practices applicable to all Plaintiffs that resulted in Defendants' failure to compensate them for all of their earned minimum wages, gap time wages, and overtime wages, including, but not limited to: (i) enforcing a "blanket exemption policy" and misclassifying all Private Client Group Financial Advisors as exempt from the FLSA's overtime pay and minimum wage requirements, notwithstanding the fact that their commonly held job duties, as articulated in a single job description document and other sources, involved exclusively nonexempt inside sales and/or production of Defendants' financial products and/or paid financial services; (ii) implementing and enforcing an unlawful "kick back" compensation scheme which forced Financial Advisors to forfeit their earned commission compensation and return it to the Defendants through unlawful adjustments, deductions, credits and debits capable of reducing their salaries below a guaranteed minimum of  $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions incorporating a "salary basis" test; and (iii) failing to fully and finally guarantee the compensation paid to Financial Advisors by relying on loan-based compensation arrangements such as non-guaranteed draws and interest accruing promissory notes, normally though bimonthly reconciliations against earned commissions, compensation arrangements which did not meet the FLSA or NYLL's definition of earned wages such that their compensation fluctuated and was capable of, and regularly did, fall below a guaranteed minimum of $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions incorporating a "salary basis" test.

5.      Plaintiffs regularly worked over 40 hours in a workweek in order to satisfy their weekly obligations, and Defendants unlawfully failed to pay lawful overtime premiums to them

for all hours worked over 40 in a given workweek as required by federal and state law, failed to regularly pay the federal and state statutory minimum hourly wage, failed to pay all "gap time" owed to the Plaintiffs under state law, and made deductions from their wages for reasons which were unlawful.  As a result, Plaintiffs have damages capable of calculation on a class-wide basis by common methodology.

6. The Collective Class is made of all persons who are or have been employed by Defendants as commissioned Financial Advisors in the Private Client Group in Defendants' retail brokerage operations throughout the United States within three years of this action's filing date through the date of the final disposition of this action, equitably tolled for Defendants' failure to post notice or otherwise advise Plaintiffs of their rights under the FLSA, (the "Collective Class Period") and who were subject to the aforementioned common policies and practices which violated the FSLA and resulted in nonpayment of the federal minimum wage for all hours worked and overtime wages for all hours worked over 40 in a week.

7. The Rule 23 Class is made up of all persons who are or have been employed by Defendants as commissioned Financial Advisors in Defendants' brokerage operations throughout New York State within six years of this action's filing date through the date of the final disposition of this action, equitably tolled for Defendants' failure to post notice or otherwise advise Plaintiffs of their rights under the NYLL, (the "Class Period") and who were subject to Defendants' common unlawful policies and practices which violated the NYLL and resulted in nonpayment of overtime wages for all hours worked over 40 in a workweek, the NY State minimum wage for all hours worked, gap time wages for uncompensated hours under 40 in a workweek, and unlawful deductions from wages.  Plaintiffs eligible for participation in the Rule 23 Class shall be identified herein as "Rule 23 Class Members".

4

## PARTIES

8.      Individual and Lead Plaintiff and Putative Class Representative Plaintiff Michelle F. Hartley was a commissioned Financial Advisor in the Private Client Group previously employed in Defendants' Garden City, New York office.  Plaintiff resides in Malverne, New York.  Plaintiff was employed by Defendants from June 2005 through February 2014 as a Financial Advisor.  She was employed with Wachovia and transitioned to Wells Fargo's Private Client Group in May 2009 following a merger.  Plaintiff was paid on an IRS Form W2-A for commissioned workers.

9.      Individual and Lead Plaintiff Maria G. DeGennaro was a commissioned Financial Advisor in the Private Client Group previously employed in Defendants' Babylon, New York office.  Plaintiff resides in West Islip, New York.  Plaintiff was employed by Defendants from March 2009 through May 2014.  She began her employment with Wachovia and transitioned to Wells Fargo's Private Client Group in May 2009 following a merger.  Plaintiff was paid on an IRS Form W2-A for commissioned workers.

10.     Defendant Wells Fargo & Company is a diversified financial services company and financial holding company, as defined in 12 C.F.R § 225.81, that is publicly traded on the New York Stock Exchange.  Defendant Wells Fargo & Company is registered with the Federal Reserve Board as a financial holding company in accordance with the Gramm Leach Bliley Act of 1999.  Defendant Wells Fargo & Company has business operations in New York State and, through its subsidiaries, maintains offices and conducts business in the State.  Defendant Wells Fargo & Company is incorporated under the laws of Delaware and maintains headquarters in San Francisco, California.  At all relevant times, Defendant Wells Fargo & Company met the definition of Plaintiffs' "employer" under all applicable statutes.

11.     Defendant Wachovia Securities Financial Holdings, LLC ("Wachovia") is a holding company that is indirectly owned by Wells Fargo.  Defendant Wachovia Securities Financial Holdings, LLC, a Delaware limited liability company, with its principal place of business in Richmond, Virginia.  Defendant Wachovia Securities Financial Holdings, LLC is registered to do business in New York State and maintains business operations and conducts business in New York State through its subsidiaries.   At all relevant times, Defendant Wachovia Securities Financial Holdings, LLC met the definition of Plaintiffs' "employer" under all applicable statutes.

12.     Defendant Wells Fargo Advisors, LLC ("Wells Fargo Advisors" or "WFA") is one of two registered broker-dealers operating under the trade name Wells Fargo Advisors. Defendants Wells Fargo Advisors, LLC is a wholly owned subsidiaries of Defendant Wells Fargo & Company incorporated under the laws of Delaware and headquartered in St. Louis, Missouri.  Defendant Wells Fargo Advisors, LLC is a non-bank affiliate of Wells Fargo & Company organized for reporting and management purposes under the parent company's Wealth, Brokerage and Retirement operating segment.  Defendant Wells Fargo Advisors, LLC provides advisory services, asset management, brokerage services, estate planning strategies, retirement planning, portfolio analysis and monitoring, and other financial services through registered representatives known as Financial Advisors.  Defendant Wells Fargo Advisors, LLC was formerly known as Wachovia Securities, LLC until May 1, 2009, when it legally changed names following Wells Fargo's acquisition of Wachovia Corporation.[2]  Defendant Wells Fargo Advisors, LLC is registered to do business in New York State and maintain business operations

---

[2] Wachovia Securities, LLC, now known as Wells Fargo Advisors, LLC, is a wholly owned subsidiary of Wachovia Securities Financial Holdings, LLC, which is, in turn, a wholly owned subsidiary of Wells Fargo & Company.

and conduct business in New York State.   At all relevant times, Defendant Wells Fargo

Advisors, LLC met the definition of Plaintiffs' "employer" under all applicable statutes.

13.     As a broker subsidiary, Wells Fargo Advisors, LLC is regulated by the Securities

Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA).   It is a

broker-dealer registered with the SEC pursuant to Section 15(b) of the Exchange Act and a

registered investment adviser pursuant to Section 203(c) of the Investment Advisers Act of 1940.

14.     All Defendants have operated together as a common enterprise in conducting

business, including the business practices described in this Complaint.  The Defendants are

interrelated companies that have common policies and practices with respect to corporate code of

conduct, human resources, and operations, common ownership, officers, managers, product

focus, and corporate purpose.

15.     All of the Wells Fargo entities are successors in interest of Wachovia's liabilities

such that Wells Fargo is liable for the unlawful acts alleged herein committed while Plaintiffs

and the Putative Class and Collective Class members were employed with Wachovia pursuant to

identical or nearly identical common compensation plans that were adopted, upon admission and

public statement by Wells Fargo, with almost no changes.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337

and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The

Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

17.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA

pursuant to 29 U.S.C. § 207 *et seq.*

18.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in the United States District Court, Eastern District of New York pursuant to 28 U.S.C. § 1391, because the wage violations which give rise to Plaintiffs' claims occurred in this District.

20.     Defendants are subject to personal jurisdiction in New York.

## WAGE AND HOUR AND COMMON LAW COLLECTIVE CLASS AND CLASS ACTION FACTS

**Wells Fargo's Non-Independent Financial Advisor Workforce:  Private Client Group And Wealth Brokerage Services**

21.     Consistent with other large national broker-dealers, Wells Fargo Advisors sells non-proprietary financial products to their current and prospective clients and provides sales-related investment advice on a fee or commission basis through licensed retail-level investment advisors.

22.     These retail services, referred to in the financial services industry as "wealth advisory services," consist of the sale of financial products to current and prospective clients, including sales-related investment research and advice, and order execution, among other individual sales-related services.

23.     Across the industry, these services are typically provided by non-independent broker-dealers with a national brand and multiple branch locations.  These broker-dealers are known as "wirehouse brokers" or "wirehouse firms" and employ the great majority of the advisors in the financial services sector.

24.     Wells Fargo Advisors is one of four wirehouse firms and the third largest brokerage firm in the United States employing approximately 18,000 registered representatives,

8

or retail investment advisors, in retail branches and standalone brokerage offices across the country.

25.    Approximately 15,000 of the Registered Representatives are Financial Advisors required to possess their Series 7 license, including those in the Private Client Group.  The remaining registered representatives are in-branch platform bankers, or Licensed Bankers, required to possess their Series 6 license only.

26.    The firm has three primary models under which an Advisor can work: the traditional channel, the independent channel (franchised network of independent contractors known as the Financial Network) or the hybrid model, which is called "profit formula."

27.    Of the 15,000 Financial Advisors, approximately 11,000 work in the traditional brokerage channel of Wells Fargo Advisors known as the Private Client Group in standalone brokerage offices, including the Plaintiffs, while the remaining 4,000 work in the in-bank brokerage channel, known as Wealth Brokerage Services.

28.    Wells Fargo's Financial Advisors are responsible for in-bank and traditional brokerage services for the client segment representing individuals regarded as "affluent" and possessing $100,000 to $2 million in investable assets.  A small number of Wealth Management Financial Advisors provide traditional wealth advisors services to the client segment representing above $2 million in investable assets.

**The Plaintiffs Common "Inside Sales" and "Production" Duties, Compensation Plan, and Regulatory Obligations**

29.    Plaintiffs were employed by Defendants in their Private Client Group as inside sales or sales production employees whose duties were set forth in uniform, company-wide policies and procedures.

30.     Plaintiffs were compensated exclusively based on their sales of financial products and financial services.

31.     Plaintiffs were responsible for contacting current and former clients, as well as "cold calling" prospective clients, for the purposes of making individual sales pitches and consummating sales relating to the financial products and services Defendants sold.

32.     Plaintiffs performed between 80% and 100% of their sales duties inside Defendants' offices or inside their home offices.

33.     Plaintiffs are responsible for continually cultivating or producing sales among their established clients.

34.     The specialized knowledge that Plaintiffs use in conducting their primary work duties is customarily acquired through on-the-job training and experience.

35.     WFA adheres to a broker compensation plan which defines in writing the common compensation arrangement for all Financial Advisors in the Private Client Group,

36.     Further, all Financial Advisors in Defendants' Private Client Group are required to possess the "Series 7" license requirement for registered representatives, and abide by the "Know Your Customer" rules established by FINRA.

37.     The specialized knowledge acquired for the Series 7 examination does not involve a "prolonged course of specialized intellectual instruction" akin to the specialized instruction required to obtain an advanced degree; the instruction is not "intellectual" but instead simply informs people about the laws, rules, and regulations governing their work.

38.     WFA also insists on numerous penalties and deductions for broker error and administrative costs, primarily, as part of its broker compensation plan that constitutes unlawful deductions under the NYLL and state interpretive regulations.

39.     For instance, according to Defendants' policies, if a Financial Advisor makes an error in executing a trade, WFA cancels the broker's anticipated commission for that trade and, if WFA incurs any loss based on the error, WFA unlawfully deducts that loss from the Financial Advisor's commissions in their next paycheck.

40.     Further, according to Defendants' policies, if a Financial Advisor's error results in liability for Defendants and attorneys' fees are incurred as a result, the Financial Advisor is responsible for indemnifying Defendants for the fees and WFA unlawfully deducts that loss from the Financial Advisor's commission in their next paycheck.

41.     Additionally, according to Defendants' policies, if a Financial Advisor requests an administrative assistant or paid intern, the cost to the enterprise of employing the administrative assistant or paid intern, including their full salary or wages, are the obligation of the Financial Advisor and WFA unlawfully deducts that loss from the Financial Advisor's commission in their next paycheck.

42.     Finally, for the period prior to November 6, 2012 when the New York Labor Law was amended, Defendants' broker compensation policies including a scheme of advancing nonguaranteed draw compensation and loan compensation (forgivable promissory notes) to its Financial Advisor workforce and recouping those amounts though unlawful deductions from future earned commissions.

**The Lead Plaintiff's Employment With Wachovia and Wells Fargo Advisors Under the "Kickback" Compensation Plan**

43.     Ms. Hartley was originally recruited from Edward Jones to work for Wachovia as a Financial Advisor and Associate Vice President in June 2005.

44.     Ms. Hartley was a top producer in her office, leading her office in certain metrics such as percentage of key households transitioned to "Envision Plans," WFA's managed money platform.

45.     Ms. Hartley's trailing 12-month production varied between $350,000 and $450,000 dollars, placing her in the middle-range of producers across WFA and above median production levels for her Garden City office.

46.     While employed, Ms. Harley qualified for and received numerous bonuses and awards, including over $200,000 in forgivable loan "bonuses" which she repaid with interest.

47.     While Ms. Hartley was employed with Wachovia and Wells Fargo, she was forced to pay for the cost of an assistant and an intern, both of whom she needed to assist her with her advisor practice.

48.     Wachovia and WFA made deductions from Ms. Hartley's earned wages to cover the expense of this assistance.

49.     Wachovia and WFA made other unlawful deductions from Ms. Hartley's earned wages as well, including deductions for the repayment of promissory notes and recoverable draws, interest payments on the notes, fees associated with broker error, and attorneys' fees for matters involving broker liability.

50.     Consistent with the other Plaintiffs, Ms. Hartley received a nonguaranteed recoverable draw in the amount of $1088 biweekly during the class period.

51.     Ms. Hartley's draw was subject to a monthly offset against earned commissions, which was labeled as an "adjustment" on the Plaintiffs' commission statements.

52.     Ms. Harley received more than one biweekly paycheck during her employment for Defendants where her compensation was zero dollars, or she had a balance due that was carried forward to the next month and charged against future earned commission income.

53.     During certain workweeks while employed by Defendants, as a result of these practices, Ms. Hartley's compensation fell below the FLSA and NYLL "salary basis" minimum necessary for asserting the "white collar" exemptions as well as the Federal and New York minimum wage.

54.     Ms. Harley took disability leave in late 2013 that carried over to 2014.

55.     While Ms. Hartley was on leave, her clients and accounts were migrated to other brokers without her knowledge.

56.     Having reached the end of her endurance with respect to the hostile work environment she experienced in WFA's Garden City office which included deeply offensive and racially degrading emails still in her possession, and having no book of business to return to, Ms. Hartley was constructively discharged in February 2014.

**The Wachovia Merger: Wells Fargo Advisors Integrates Wachovia's "Kickback" Compensation Structure For Financial Advisors Without Substantive Changes**

57.     In late 2008, Wells Fargo announced that it would merge with Wachovia in a $15.1 billion all-stock merger notwithstanding concerns about Wachovia's loan portfolio, which Wells Fargo would be required to absorb.

58.     In order to bolster Wachovia's lagging stock price, Wells Fargo announced publicly that it would mark Wachovia's troubled assets down to fair value and absorb approximately $53.2 billion in losses.

59.     Wells Fargo incurred many other additional expenses of the merger, including $10 billion in costs.

60.     In order to further alleviate the pressure of absorbing Wachovia's toxic assets and the merger's hefty price tag, Wells Fargo began a capital-raising campaign and raised over $20 billion by issuing new shares.

61.     In purchasing Wachovia, Wells Fargo inherited Wachovia's retail brokerage, including thousands of investment advisors and private bankers in brokerage offices and retail bank stores throughout the east coast, completing Wells Fargo's goal of expanding its west coast wealth advisory practice to a nationwide operation.

62.      Under pressure to keep a lid on its stock price, manage ballooning expenses, and compete with larger national brokerages like Meryl Lynch and Morgan Stanley, Wells Fargo Advisors began aggressively recruiting retail investment brokers in the hopes of establishing a respectable market share position in order to demonstrate, as a new brokerage to the national stage, that it could compete with the largest firms.

63.     Part and parcel with this strategy was the need to maintain an ambitious integration timetable in order to ensure that its new wealth management broker workforce was immediately productive.

64.     Optimizing broker productivity was especially important given that industry commentators and market analysts would evaluate the success of the integration and the brokerage practice as a whole by the amount of total revenue earned by their wealth management practice in the fiscal quarters that followed.

65.     Thus, the post-merger integration of Wachovia's legacy brokerage workforce and the revenue generated by Wells Fargo's new brokerage practice played an oversized role in the overall success of the firm following the merger.

66.     To this end, Wells Fargo began an extensive recruitment campaign immediately following the merger designed to attract brokers with larger and more established books of business.  A naturally higher attrition rate following the merger allowed the firm to purge its broker workforce of underperformers.

67.     However, complicating the integration and production surge, expenses associated with the merger slowed WFA's progress towards profitability.

68.     It was not until 2012 that Wells Fargo began to stabilize with soring growth in its loan business and with all other business areas realizing consistent profit.

69.     In their rush to complete the integration successfully and demonstrate profitability, WFA ran into problems over integrating Wachovia's payroll systems, known and referred to as "legacy" and compensation plan for Financial Advisors.

70.     Rushed to complete the payroll conversion by the end of 2009, Wells Fargo rapidly converted Wachovia to its payroll process.

71.     Given the magnitude of the payroll conversion and broker compensation plan changes, Wells Fargo managers responsible for integrating these functions decided not to hold up the larger integration efforts for the sake of problems specific to the brokerage or any other line of business.

72.     Further, prior to the Wachovia merger, Wells Fargo did not have a large retail brokerage operation.

73.     For all of these reasons, Wells Fargo was unprepared to harmonize the legacy payroll systems and broker compensation plans.

74.     Instead of careful integration of broker compensation plans and broker compensation, Wells Fargo committed to save resources and time and not reinvent the wheel,

and instead simply adopted the Wachovia compensation plan for Financial Advisors in the Private Client Group (but not Wealth Brokerage Services) virtually word for word.

75.     For instance, in their rush to integrate the payroll and compensation systems, Wells Fargo overlooked the potential impact of differences between the Wachovia's legacy payroll systems and Wells Fargo's system causing tax withholding problems for the new broker workforce and compounding Wachovia's long-standing failure to bring its broker compensation plan into wage and hour compliance.

76.     Specifically, Wells Fargo failed to take into consideration the fact that Wachovia's advisor workforce was paid once a month while Wells Fargo's advisors were paid twice a month, and that Wachovia's compensation practices allowed for a monthly recoverable draw and monthly reconciliation process, practices that were previously the subject of a class action lawsuit nearly identical to this lawsuit, while Wells Fargo's draw payment and reconciliations were bimonthly.

77.     Following a confusing series of purported fixes, Wells Fargo's Financial Advisors, including the Plaintiffs, are now paid a recoverable "minimum guaranteed draw" and any earned commissions bimonthly in an un-reconciled lump amount disbursed in two gross amounts to their broker account which are reconciled and reduced to a net amount in a separate end-of-the-month reconciliation involving numerous "adjustments," or offsets against earned commissions, including an adjustment for the amount of that month's "minimum guaranteed draw" and any promissory note repayment obligations.

78.     Thus, the monthly "minimum guaranteed draw," was itself an "adjustment" against Financial Advisor's commissions at the end of the month and therefore not actually "guaranteed" in any sense.

79.     Since the application of any "adjustment" took place only once a month at the end of the month, deductions were debited from the advisors' accounts at the time of the issuance of the end of the month commission reconciliation statement.

80.     The adjustment associated with the bimonthly draw ($1088 bimonthly, or $2076 subject to monthly adjustment) cannot, according to Wells Fargo's compensation plan, create a deficit that is carried forward each month and applied against future commission.

81.     However, other adjustments, debits and credits, and deductions, including forgivable loan repayment obligations (promissory notes) and overdraft withdrawals against the draw, could create a deficit that was carried forward each month and reconciled against the next month's earned commissions.

82.     Also, while the monthly draw adjustment cannot create a deficit that is carried forward, in months where the broker had earned little or no commission, it can reduce a broker's monthly compensation to zero dollars, and for the Lead Plaintiffs and the Putative Class and Collective Class members, it often did.

83.     With the exception of the bimonthly payment structure, the aforementioned terms relating to the brokers' compensation plan and their draw against commissions were identical under Wachovia's legacy payroll compensation plan.

**Financial Advisors Are Paid Through a Scheme of Loan-Based Compensation Including Recoverable Draw and "Bonuses" in the Form of Forgivable Loans**

84.     At WFA, and across the retail financial industry, Plaintiffs were eligible for recruitment, start-up, retention, and production "bonuses" which were, in fact, promissory notes or up-front forgivable loans subject to repayment with interest.

85.     Under Wachovia and WFA's standard promissory note terms applicable to the Plaintiffs, the loans are forgiven on a monthly basis and, if the financial advisor remains through the duration of the forgiveness period of the loan, the broker does not have to repay the loan.  If, however, the Financial Advisor resigns from the brokerage firm, or is terminated, before the loan is forgiven, the broker is contractually obligated to repay the outstanding amounts owed on the loan including interest.

86.     As a matter of standard policy, Wachovia as a Wells Fargo predecessor entity, WFA and all wirehouse firms will move to collect the outstanding amount still owed on the loan.

87.     By definition, promissory notes, including the aforementioned bonuses awarded by WFA and Wachovia, involve payments subject to repayment – or forgiveness against earned commissions - and, according to uniform precedent, are neither a salary nor wages under the FLSA but rather loans.

88.     The Lead Plaintiffs and, upon information and belief, the majority of the Putative Class accepted recruitment, start-up, or transitional forgivable loans with Wachovia's legacy plan and/or Wells Fargo's plan in order to finance building or transitioning their book of business.

89.     Upon information and belief, the majority of the Putative Class accepted production bonuses during their employment that were promissory notes subject to identical terms as the abovementioned start-up, recruitment or transitional loans.

90.     The Lead Plaintiffs and all other Plaintiffs who took part in these promissory note programs were obliged to sign a "loan repayment authorization" which committed the Plaintiffs to repay the loan payment with interest by payroll deductions from their monthly compensation;

or by separately mailed check.  The Lead Plaintiffs opted for repayment by payroll deductions from their monthly compensation.

91.     Further, under the WFA and Wachovia forgivable loan bonus programs, Financial Advisors are obligated to reimburse the firm for any costs of collection in the event of default including attorneys' fees and costs.

92.     Also, according to WFA's traditional pay formula, advisers are paid 22% of all fees and revenue they generate below an established monthly dollar total called the hurdle.  Then they get to keep 50% of revenue exceeding that threshold.

93.     Following the completion of the transition from the Wachovia's legacy compensation structure to the Wells Fargo plan in 2010, the Lead Plaintiffs and all Financial Advisors were being paid a 24% payout on the first $10,000 generated in commissions and fees each month (known as "the hurdle"), and a 50% payout on all commissions and fees beyond that. For 2013 the hurdle was $12,000.

94.     For 2014, WFA advisers can qualify for the 50% payout rate with $11,500 in monthly production if they have achieved certain other business-related goals.  Advisers who have achieved fewer of these goals face a $12,500 hurdle, and those that don't meet any of the goals face a $13,250 hurdle.

95.     Further, as discussed above, both the WFA and Wachovia's legacy compensation plan allowed for the election of draw compensation by its Financial Advisor workforce, often for those periods in which commission income was low.

96.     Upon information and belief, the large majority of the Financial Advisor workforce during the Class and Collective Class Periods elected draw payments.

97.     In additional, both WFA and the Wachovia pay plan included some deferred compensation, production and other "bonuses" which were in fact loans, and an expense account.

98.     Previously during the Class Period, while Ms. Hartley was employed by Wachovia (from 2005 to 2009), Ms. Hartley and the class of Financial Advisors were subject to a similar payout grid, including a monthly hurdle, which differed only slightly and paid a flat percentage of the fees and commissions produced by brokers on a single-tier basis.

99.     However, as mentioned above, both Wachovia and Wells Fargo paid Plaintiffs and the Class and Collective Class of Financial Advisors every pay period with a recoverable draw that was subject to offset against earned commissions and therefore not guaranteed.

100.    Wachovia's draw payment policy, previously scrutinized in the context of prior overtime wage litigation, involved payment of a single monthly draw to its broker workforce, including Plaintiffs, which was similarly recoverable as an offset against commissions .

**WFA Makes Intentional Efforts To Disguise Their Nonguaranteed Kickback Draw in the Private Client Group's Broker Compensation Plan and Promotional Material**

101.    Not only did Wells Fargo fail to make the appropriate changes to the Wachovia's legacy compensation plan, some of the limited number of changes Wells Fargo *did* make reflect an intentional effort to hide the unlawful practices.

102.    Specifically, while the 2009 Wachovia compensation plan contained a sentence advising Financial Advisors of the adjustment practice with respect to the draw ("Draws will be an adjustment to Net Eligible Revenue in calculating monthly commission"), in the 2010 Wells Fargo version of the compensation plan, which otherwise adopted the language of the Wachovia compensation plan nearly word for word, the sentence was removed and not replaced with anything that identified the bimonthly draw as recoverable.

103.    In fact, while the Wachovia compensation plan referred to the bimonthly draw as the "Minimum Draw," the Wells Fargo compensation plan refers to it as a "Minimum *Guaranteed* Draw" thereby creating the misimpression that it is nonrecoverable.

104.    As financial industry employers in the retail brokerage trade, Wachovia and Wells Fargo managers, and the lawyers and employees who drafted the compensation plans, are familiar with the terms "nonrecoverable" or "forgivable" draw and what they mean in the industry.  Neither firm chose to use those terms in defining the draw for purposes of their respective compensations plans.

105.    However, while Wells Fargo failed to define or use the term "nonrecoverable draw" in its compensation plan, it is used by Wells Fargo on the Financial Advisor's monthly compensation statement, despite not having been defined in the compensation plan or any other materials distributed to the Financial Advisors.

106.    Further, for the purposes of the compensation plan and/or compensation statement, the term "nonrecoverable draw," refers to the amount left over (i.e. still owed) *after* the draw adjustment is performed, meaning that the "nonrecoverable" portion of the draw is only that amount left over after the monthly draw has been deducted from the Financial Advisor's earned commissions that month.

107.    Under industry standards, this form of a draw is not considered "nonrecoverable" given that it is subject to at least partial offset and at times complete offset if the Financial Advisor's commissions were enough to cover the full draw amount.

108.    In the event that a broker has earned little or no commission income for the month, the "nonrecoverable" portion is capable of falling below $455 per week, the minimum required to meet the "salary basis" requirements under state and federal law.

109.    In those months where a Financial Advisor's commissions do not exceed the monthly draw, or where they do but other deductions such as forgivable loan repayments reduce them to an amount equal to or less than the monthly draw, a Financial Advisor's compensation could net out at zero for the month assuming no other compensation was due to him or her.

110.    Further, while a Financial Advisor's monthly draw adjustment could not result in a deficit that could be carried forward to future pay periods subject to offset by future commissions, other deductions such as forgivable loan repayments *could* cause a deficit and the Financial Advisor would be indebted to Defendants for the deficit amount.

111.    Unlike Wells Fargo, the three other wirehouse firms pay a portion of bimonthly compensation to their financial advisors as a forgivable draw which meets or exceeds $455 per month and is not subject to reduction below federal and the state minimum "salary basis" requirements.

112.    WFA also made other deductions from Financial Advisors' compensation which were not made for their benefit and were instead associated with covering WFA's operational costs, including costs associate with broker error (trade error penalties and fees, attorneys' fees, etc.), the costs associated with operating the enterprise (employing broker assistants and paid interns), and, for the period prior to November 6, 2012 when the New York Labor Law was amended, nonguaranteed draws and loans that were advanced and recouped, as well as interest amounts on loans and promissory notes.

113.    These expenses were unlawfully deducted from Financial Advisor's previously earned and paid compensation in their broker accounts during the end of the month reconciliation process.

114.    Unlike Wells Fargo, the three other wirehouse firms were each previously sued for overtime violations and instituted a guaranteed minimum draw in order to avoid future litigation consistent with 29 C.F.R. § 541.200(a)(1) and the Department of Labor's Opinion Letters.

115.    According to those authorities, the formula to calculate commissions may adjust for cancelled trades, trade errors, expenses and other trading-related losses, which affect only the calculation of commissions, but not the payment of the guaranteed minimum amount of at least $455 per week.

116.    As a matter of common policy applicable to the Class and Collective Class, Defendants did not guarantee any portion of Financial Advisor's compensation and, as a result, their calculation of commissions could, and did, result in adjustments for cancelled trades, trade errors, expenses and other trading-related losses, as well as for repayment of loans and draw adjustments, which reduced broker's compensation below at least $455 per week.

117.    Further, Defendants compensation scheme, predicated on numerous potential "kickbacks" and unlawful deductions, resulted in average compensation statistics that are far lower than the amounts assumed by non-industry experts who simply assume all stockbrokers, even retail-level stockbrokers, are highly compensated.

118.    In addition, contrary to conventional beliefs about the industry, the mean annual salary for advisors as reported by the Bureau of Labor Statistics was just over $94,000, which would be lower than the "highly compensated employee" threshold of $100,000 under the FLSA, but even this statistic is deceiving.

119.    Wealth management firms pay a disproportionate amount of incentive compensation to the top ten percent of their broker workforce.

120.    Paying disproportionately high compensation to these elite brokers is justified by the wirehouse firms because their portfolios account for the majority of the their firms profits.

121.    According to the Bureau of Labor Statistics, the middle 50% of all advisors had an average salary of just $65,000.

122.    Many factors contribute to low broker compensation, including high numbers of brokers who abandon or wash out of the industry having gone bankrupt or been unable to create a book of business in their first two years.

123.    Further, as demonstrated above, a sizeable amount of the "compensation" which contributes to the myth of high broker pay that must be repaid with interest.

**Defendants Violations of the FLSA and NYLL Were Intentional and Fraudulent**

124.    In sum, Defendants violated and continue to violate the FLSA and the NYLL by misclassifying Defendants' inside-sales and production-based workforce of Financial Advisors as exempt administrative employees and not guaranteeing a weekly salary of at least $455 and instead paying Plaintiffs a recoverable draw and loan-based compensation in addition to any earned commissions, all of which were subject to an end of the month reconciliation process involving unlawful "adjustments" and deductions, i.e. deductions against earned commissions, including an "adjustment" for the draw itself, which can, and regularly do, bring the Plaintiffs' compensation below the $455 threshold for weekly compensation, sometimes netting out at zero and resulting in no pay whatsoever for a week's work.

125.    Defendants enforcement of the Wachovia compensation plan for Financial Advisors in the Private Client Group, and by implication the post-merger Wells Fargo compensation plan for the same category of Financial Advisors which failed to satisfy the FLSA's salary basis test, as well as their utilization of a common job description for Financial

Advisors in the Private Client Group which resulted in the uniform performance of nonexempt

work, among other contracts and policies, resulted in the misclassification of Defendants' entire

workforce of Financial Advisors in the Private Client Group.

126.    These policies commonly apply to each member of the Putative Class and

Collective Class and, as such, class and collective action treatment is warranted.

127.    As a result, and given the nonexempt nature of Plaintiffs' duties, Defendants

improperly classified Plaintiffs as exempt and ineligible from the federal and state minimum

wage and overtime pay.

128.    More specifically, due to Defendants' compensation plan and the aforementioned

policies, Financial Advisors' wages were capable of falling below the NYLL and FLSA

minimum wage for all hours worked in any given workweek, thus violating the minimum wage

provisions of those acts.

129.    Further, due to Defendants' compensation plan and the aforementioned policies,

Financial Advisors were ineligible for overtime wages as defined by the NYLL and FLSA.

130.    Both Lead Plaintiffs and, upon information and belief, member of the Putative

Class and Collective Action, worked weeks during the Class and Collective Action periods in

which they were not paid any overtime wages despite having worked between 60 to 80 hours.

131.    During some weeks, both Lead Plaintiffs and, upon information and belief,

members of the Putative Class and Collective actions, worked weeks during the Class and

Collective Action periods during which they were not paid any wages despite performing work

that is compensable under the FLSA and the NYLL.  Both Lead Plaintiffs' hourly regular rate of

pay fell below the state and federal minimum wage during weeks in which the hours they worked

watered down their total weekly compensation, which occurred numerous times during the Lead Plaintiffs employment.

132.    The compensation plan and the aforementioned practices, to the extent they reduced earned commissions or wages for those hours worked during "gap" or straight time non-overtime hours, separately violated the NYLL.

133.    Further, both Lead Plaintiffs had deductions take from their pay for broker error and, for Plaintiff Hartley, for the cost of employing an administrative assistant and had deductions assessed against earned wages as a result.

134.    Finally, Wells Fargo adopted Wachovia's legacy broker compensation plan despite knowing that it violated the FLSA and the NYLL and that it was unlawful for many different reasons.  In fact, as previously mentioned, Wachovia was already successfully sued by a class of identical financial advisors for overtime violations.  The Wachovia plaintiffs alleged classwide overtime violations based largely on its unlawful compensation plan, identical to the one at issue in the immediate litigation, and ultimately settled with Wachovia on a classwide basis.  *See Wachovia Securities, LLC Wage and Hour Litigation MDL-1807*, Civ. No. SACV 05-1031 DOC (RNBx) C.D. Cal.  2005.  Wachovia did not remediate these policies prior to the merger.

## COLLECTIVE ACTION ALLEGATIONS

Plaintiffs bring FSLA claims on behalf of themselves and other employees similarly situated as authorized under 29 U.S.C. § 216(b).  The employees similarly situated are:

**Collective Class:**        All persons who are or have been employed by Defendants as commissioned Financial Advisors in the Defendants' Private Client Group throughout the United States during the equitably tolled Collective Class Period and who (i) earned and were not compensated overtime wages and minimum wages as defined by the Fair Labor Standards Act and other

federal regulations; and (ii) were subjected to Defendants' common unlawful policies, practices, and contracts, including: (ii)(a) enforcing a "blanket exemption policy" and misclassifying all Private Client Group Financial Advisors as exempt from the FLSA's overtime pay and minimum wage requirements notwithstanding the fact that their commonly held job duties, as articulated in a single job description document and other sources, involved exclusively nonexempt inside sales and/or production of Defendants' financial products and/or paid financial services in selling or promoting the sale of Defendants' financial products to existing or potential clients on a day-to-day basis; (ii)(b) implementing and enforcing an unlawful "kick back" compensation scheme which forced Financial Advisors to forfeit their earned commission compensation and return it to the Defendants through unlawful adjustments, deductions, assessment of interest on promissory notes, credits and debits capable of reducing their salaries below a guaranteed minimum of $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions incorporating a "salary basis" test; and (ii)(c) failing to fully and finally guarantee the compensation paid to Financial Advisors by relying on loan-based compensation arrangements such as non-guaranteed draws and interest accruing promissory notes which were forgiven according to the terms of the note, normally though bimonthly reconciliations against earned commissions, compensation arrangements which did not meet the FLSA's definition of earned wages such that their compensation fluctuated and was capable of, and regularly did, fall below a guaranteed minimum of $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions incorporating a "salary basis" test.

135. Defendants employed the Collective Class Members during the Collective Class Period as employees, as those terms are understood under the FLSA and the NYLL.

136. Defendants employ Financial Advisors to sell financial products and investment advice in the State of New York and throughout the United States.

137. The Collective Class Members are uniformly misclassified by the Defendants as exempt under the FLSA according to common policy applicable to all Plaintiffs.

138. At all times during the Collective Class Period, Defendants authorized this misclassification practice and have, as a matter of policy, not paid the Collective Class Members lawful overtime premiums for hours worked in excess of 40 hours in a work week and failed to

pay them the federal minimum wage for all hours worked.

138.   All of the Collective Class Members perform the same functions regardless of assignment, supervisor or office location pursuant to a uniform job description.

139.   All of the Collective Class Members were also subject to compensation policies that did not result in a guaranteed salary equal to or more than $455 per week and which therefore failed the FLSA's "salary basis" test.

140.   During the Collective Class Period, the Named Plaintiffs worked between 60 and 80 hours a week and did not receive any premium compensation as required by the FLSA for any of the overtime hours they worked.

141.   As such, the Named Plaintiffs and the Collective Class suffered damages for unpaid earned overtime wages under the FLSA in each of the weeks they worked during the Collective Class Period.

142.   Also, the Named Plaintiffs suffered damages for unpaid earned minimum wages under the FLSA in each of the weeks in which their weekly compensation, considering the number of hours they worked, did not result in a regular rate of pay that exceeded the federal minimum wage.  This occurred multiple times during the Collective Class Period for the Named Plaintiffs and, upon information and belief, for other members of the Collective Class.

143.   Further, under the relevant law, weekly payments that exceeded minimum wage requirements cannot offset other weekly payments that did not meet minimum wage requirements.  Accordingly, the Defendants remain liable for such deficiencies, which should be assessed on a weekly basis.

144.   Defendants' conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Plaintiffs and the Collective Class.

145.    Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and the Collective Class, and as such, notice should be sent to the Collective Class.

146.    There are numerous similarly situated current and former employees of Defendants who were subject to the aforementioned policies in violation of the FLSA who would benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity to join in the present lawsuit.

147.    Those similarly situated employees are known to the Defendants and are readily identifiable through Defendants' records.

## CLASS ALLEGATIONS

148.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following defined classes under the substantive law of New York:

**Rule 23 Classes:**     **WAGE CLASS:**     All persons who are or have been employed by Defendants as commissioned Financial Advisors in the Defendants' Private Client Group throughout New York State during the equitably tolled Class Period and who (i) earned and were not compensated overtime wages, minimum wages, and/or "gap time" wages as defined by the New York Labor law and other state laws and regulations; (ii) were subjected to Defendants' common unlawful policies, practices, and contracts, including: (ii)(a) enforcing a "blanket exemption policy" and misclassifying all Private Client Group Financial Advisors as exempt from the FLSA's overtime pay and minimum wage requirements notwithstanding the fact that their commonly held job duties, as articulated in a single job description document and other sources, involved exclusively nonexempt inside sales and/or production of Defendants' financial products and/or paid financial services in selling or promoting the sale of Defendants' financial products to existing or potential clients on a day-to-day basis; (ii)(b) implementing and enforcing an unlawful "kick back" compensation scheme which forced Financial Advisors to forfeit their earned commission compensation and return it to the Defendants through unlawful adjustments, deductions, assessment of interest on promissory notes, credits and debits capable of reducing their salaries below a guaranteed minimum of $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions

incorporating a "salary basis" test; and (ii)(c) failing to fully and finally guarantee the compensation paid to Financial Advisors by relying on loan-based compensation arrangements such as non-guaranteed draws and interest accruing promissory notes which were forgiven according to the terms of the note, normally though bimonthly reconciliations against earned commissions, compensation arrangements which did not meet the FLSA or NYLL's definition of earned wages such that their compensation fluctuated and was capable of, and regularly did, fall below a guaranteed minimum of $455 per week resulting in Defendants' inability to avail themselves of the FLSA exemptions incorporating a "salary basis" test.

**DEDUCTIONS CLASS**.    All Financial Advisors in Defendants' Private Client Group who earned wages and compensation and who were subjected to unlawful deductions from earned wages in violation of NYLL § 193 and other state laws and regulation prohibiting the same, including, but not limited to, repayment obligations for loans and non-forgivable draws, deductions for interest on promissory notes, the cost of employing Financial Advisor's administrative assistants and paid interns, expenses associated with trading error, and/or attorneys' fees associated with liabilities incurred by Financial Advisors.

149.    Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

150.    At all times during the Class Period, Defendants authorized a misclassification of all of its Financial Advisors, including Plaintiffs, as exempt under the NYLL and the FLSA and have, as a matter of policy, not paid them the state minimum wage for all hours worked or overtime premiums for hours worked in excess of 40 hours as defined by state law.

151.    In the alternative, Defendants have nevertheless violated NYCRR 142-2.2 and NYLL §§ 191 and 193 by failing to pay Plaintiffs and the Putative Class at least one and one-half times the New York state minimum wage for all hours worked over 40 during the class period.

152.    Defendants, pursuant to unilaterally-established and illegal policy, made deductions against earned wages due to Plaintiffs and the members of the Deductions Class, which, upon information and belief, includes all Financial Advisors in the Private Client Group,

or assessed unlawful charges against earned wages in the form of to Plaintiffs or the Putative

Class.

153.    The aforementioned deductions were not made "for the benefit of the employee"

as that term is understood under applicable law.

154.    <u>Numerosity</u>:    The Proposed Class is so numerous that joinder of all members is

impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the

relevant time period, Defendants employed over 1000 people who satisfy the definition of the

Proposed Class in New York State.

155.    Typicality:    The Plaintiffs' claims are typical of the members of the Proposed

Class.  Plaintiffs are informed and believe that, like other Financial Advisors, the putative

plaintiffs were subject to the aforementioned unlawful policies during the Class Period.  All

Plaintiffs were subject to Defendants' policy and practice of unlawfully classifying Financial

Advisors as exempt from the FLSA and the NYLL, not paying them minimum wages for all

hours worked or overtime wages for hours worked in excess of 40 per week, and/or were subject

to Defendants' unlawful practice of making illegal deductions from earned wages.

156.    Superiority:    A class action is superior to other available methods for the fair

and efficient adjudication of the controversy.

157.    Adequacy:    Plaintiffs will fairly and adequately protect the interests of the

Proposed Class, and have retained counsel experienced in complex FLSA and NYLL class and

collective action litigation.

158.    Commonality:  Common questions of law and fact exist to all members of the

Proposed Class and predominate over any questions solely affecting individual members of the

Proposed Class, including but not limited to:

a. Whether Defendants improperly classified the Proposed Class of Financial Advisors as exempt under the NYLL;

b. Whether Defendants unlawfully failed to pay lawful overtime compensation to members of the Proposed Class in violation of NYLL;

c. Whether Defendants unlawfully failed to pay the state statutory minimum wage to members of the Proposed Class in violation of the NYLL;

d. Whether Defendants employed Plaintiffs and the Proposed Class within the meaning of New York law;

e. The proper measure of damages sustained by the Proposed Class; and

f. Whether Defendants' actions were "willful."

159.    The case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendants. Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

160.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members of the Proposed Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' common and uniform policies and practices denied the Proposed Class the wages to which they are entitled. The damages suffered by the individual Proposed Class members are small compared to the expense and burden of individual prosecution of this litigation. In addition,

class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

161.   Plaintiffs intend to send notice to all members of the Proposed Class to the extent required by Rule 23.  The names and addresses of the Proposed Class are available from Defendant.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Unlawful Failure to Pay Overtime Compensation under the Fair Labor Standards Act)**

162.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

163.   Plaintiffs consent in writing to be a part of this action, pursuant to 20 U.S.C. § 216(b).  Plaintiffs written consent forms are attached hereto.  Plaintiffs anticipate that as this case proceeds, other individuals will sign consent forms and join as plaintiffs.

164.   At all relevant times, Defendants have been an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 20 U.S.C. § 203.

165.   At all relevant times, Defendants have employed and continues to employ employees, including Plaintiffs, and the Collective Class members.

166.   At all relevant times, upon information and belief, Defendants had gross operating revenues in excess of $500,000.00.

167.   The FLSA requires each covered employer to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours per work week.

168.   During their employment with Defendants, within the applicable statute of limitations, Plaintiffs and the other Collective Class members worked in excess of forty hours

per workweek without lawful overtime compensation.  Despite the hours worked by Plaintiffs

and the Collective Class members in excess of forty per workweek, Defendants willfully, in bad

faith, and in knowing violation of the Federal Fair Labor Standards Act, failed and refused to pay

them overtime compensation.

169.    By failing to accurately record, report, and/or preserve records of hours worked

by Plaintiffs and the Collective Class, Defendants have failed to make, keep, and preserve

records with respect to each of its employees sufficient to determine their wages, hours, and

other conditions and practices of employment, in violation of the FLSA, 20 U.S.C. § 201, *et seq.*

170.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA,

within the meaning of 29 U.S.C §§ 216(b) and 255(a), and such other legal and equitable relief

as the Court deems just and proper.

171.    Plaintiffs, on behalf of themself and the Collective Class, seeks recovery of their

attorneys' fees and costs to be paid by Defendants, as provided by the FLSA, 29 U.S.C. § 216(b).

### AS AND FOR A SECOND CAUSE OF ACTION
**(Unlawful Failure to Pay Minimum Wage Compensation under the Fair Labor Standards Act)**

172.    Plaintiffs allege and incorporate by reference the allegations in the preceding

paragraphs.

173.    At all relevant times herein, Plaintiffs have been entitled to the rights, protections,

and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

174.    The FLSA regulates, among other things, the payment of minimum wage by

employers whose employees are engaged in interstate commerce, or engaged in the production of

goods for commerce, or employed in an enterprise engaged in commerce or in the production of

goods for commerce, per 29 U.S.C. §206(a); 29 U.S.C. § 207(a)(1).

175.    Defendants, pursuant to its policy and practice, violated the FLSA by refusing and failing to pay Plaintiffs and other similarly situated employees minimum wage.

176.    Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from minimum wage obligations.  None of the FLSA exemptions apply to Plaintiffs or other similarly situated employees.

177.    Plaintiffs and all similarly situated employees are victims of a uniform and employer-based compensation policy.  Upon information and belief, this uniform policy, in violation of the FLSA, has been applied, and continues to be applied, to all Financial Advisors employed throughout Defendants US operations in the Private Client Group.

178.    Defendants have acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiffs and other similarly situated employees, in addition to payment of back minimum wages, are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid minimum wages described pursuant to Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b).

179.    Alternatively, should the Court find Defendant did not act willfully in failing to pay minimum wage, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Failure to Pay Lawful Overtime Premiums in Violation of NYCRR § 142.2.2 and Article 19 of the NYLL)

180.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

181.    At all relevant times, Plaintiffs were employees within the meaning of the New York Labor Law.

182.    The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

183.    Defendants have failed to pay Plaintiffs and the Rule 23 Class the overtime wages to which they were entitled under the New York Labor Law.

184.    By Defendants' failure to pay Plaintiffs and the Rule 23 Class Members premium overtime wages for hours worked in excess of 40 hours per week, they have willfully violated the New York Labor Law Article 19, §§ 650 *et seq.,* and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

185.    In the alternative, in the event of a finding that Plaintiffs and the Putative Class are exempt employees, Defendants have nonetheless violated NYCRR 142-2.2 and NYLL §§ 191 and 193 by failing to pay Plaintiffs and the Putative Class at least one and one-half times the minimum wage for all hours worked over 40 in any workweek during the class period.

186.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and the Rule 23 Class Members are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Failure to Pay Lawful Minimum Wages in Violation of NYLL § 652 and Article 19)

187.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

188.    At all relevant times, Plaintiffs were employees within the meaning of the New York Labor Law.

189.    The minimum wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

190.    Defendants have failed to pay Plaintiffs and the Rule 23 Class the minimum wages to which they were entitled under the New York Labor Law.

191.    By Defendants' failure to pay Plaintiff and the Rule 23 Class Members minimum wages, they have willfully violated the New York Labor Law Article 19, §§ 652 *et seq*., and the supporting New York State Department of Labor Regulations.

192.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and the Rule 23 Class Members are entitled to recover from Defendants their unpaid state minimum wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unlawful Deductions from Wages in Violation of NYLL § 193)

193.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

194.    At all relevant times, Plaintiffs were employees within the meaning of the New York Labor Law.

195.    The Individual Defendants exercise control over the nature and structure of the employment relationship and economic control over the relationship such that they are "employers" under the FLSA and NYLL and are therefore individually subject to liability.

196.    Section 193 of the New York Labor Law expressly prohibits an employer from making unauthorized deductions from employees' wages.

197.    Section 193 prohibits deductions from employees' wages unless the deductions are (1) expressly authorized by and for the benefit of the employee and (2) limited to the enumerated categories of permissible deductions.

198.    Defendants made deductions from the wages of the Plaintiffs and the Putative Class for purposes that are not permissible under the statute.

199.    The deductions made by Defendants were not made for their benefit.

200.    By Defendants' practice of making unlawful deductions from Plaintiffs' and class' earned wages, Plaintiffs and the members of the class were damaged in an amount to be proven at trial.

201.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and the Rule 23 Class Members are entitled to recover from Defendants all wages unlawfully deducted or charged, and all unlawful payments required by separate transaction, plus reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Proposed Collective and Classes, pray for relief as follows:

A.    That the Court determine that this action may proceed as a class action under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure;

B.    That Defendants are found to have violated the provisions of the New York Labor Law as to Plaintiff and the Class;

C.    That Defendants are found to have violated the Federal Fair Labor Standards Act as to Plaintiffs and the Collective Class;

D.    That Defendants' violations as described above are found to be willful;

E.      An award to Plaintiffs and the Class for the amount of unpaid wages owed, including interest thereon, and penalties, including liquidated damages, subject to proof at trial;

F.      That Defendants further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

G.      An award of reasonable attorneys' fees and costs pursuant to the NYLL and 29 U.S.C. § 216 and/or other applicable law; and

H.      For such other and further relief, in law or equity, as this Court may deem appropriate and just.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.


DATED:  September 3, 2014

The Law Office of Christopher Q. Davis


_____/s/_____

Christopher Q. Davis (CD-7282)
Rachel M. Haskell (RH-8248)

18 West 18th Street, 11th Floor
New York, NY 10011
Tel. 646-356-1010
Fax. 646-349-2504
*Attorneys for Plaintiff and the Proposed Class*

# FLSA CONSENT FORM

I hereby consent to be an Opt-In Party Plaintiff in a lawsuit or lawsuits against Wells Fargo and any related entities as well as other individuals who may be personally liable for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 and the New York State Labor Law, and any other applicable laws.

_Michelle F. Hartley    8/18/14_
Signature Date

_Michelle F. Hartley_
Name (Please Print)

_37 Utterby Road_
Street Address

_Malverne, NY  11565_
City, State, Zip Code

_(516) 521-3961, (516) 516-0407_
Phone Number

_mhart22@verizon.net_
Email Address

## FLSA CONSENT FORM

I hereby consent to be an Opt-In Party Plaintiff in a lawsuit or lawsuits against Wells Fargo Financial Advisors , and any related entities as well as other individuals who may be personally liable for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 and the New York Labor Law, and any other applicable laws.

*Maria G. DeGennaro, November 15, 2013*
Signature Date

*Maria G. DeGennaro*
Name (Please Print)

*3 South Country Commons*
Street Address

*West Islip, NY. 11795*
City, State, Zip Code

*Cell # 631-553-9353*
Phone Number

*genderbias68@gmail.com*
Email Address